```
                                                                1

 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF FLORIDA

 3
     EL TALLA TRADING, INC.,    )
 4   A Florida Corporation,     )
                                )   CASE NO. 09-62004-
 5              Plaintiff,      )   CV-ZLOCH/ROSENBAUM
                                )
 6        vs.                   )
                                )   DEPOSITION TAKEN IN
 7   SANDHILLS PUBLISHING       )
     COMPANY, D/B/A             )   BEHALF OF PLAINTIFF
 8   MACHINERY TRADER,          )
     A Nebraska Corporation,    )
 9                              )              COPY
                Defendant.      )
10

11   VIDEO DEPOSITION OF:  SHANE BECKER

12   DATE:  October 29, 2010

13   TIME:  9:00 a.m.
     PLACE:  Latimer Reporting, 528 South 13th
14   Street, Suite 1, Lincoln, Nebraska 68508

15   APPEARANCES:
     Robert W. Stickney   (Appearing Telephonically)
16   Attorney at Law
     One Financial Plaza
17   100 S.E. 3rd Avenue, Suite 2510
     Ft. Lauderdale, FL 33394        for Plaintiff
18          and
     John J. Hanson       (Appearing Telephonically)
19   320 SE 10th Court
     Ft. Lauderdale, FL 33316        for Plaintiff
20
     Craig Salner
21   Attorney at Law
     799 Brickell Plaza, Suite 900
22   Miami, FL 33131                 for Defendant

23

24   ALSO PRESENT:  Chuck Lewis, Margaret Stenehjm,

25   and John MacKnight, Videographer
```

*Jennifer L. Oliver, RPR, CCR*
*Latimer Reporting, Lincoln, Nebraska (402) 476-1153*

EXHIBIT C

```
                                                              7
 1      too quick.
 2              What's your date of birth?
 3      A.      October 30th, 1988.
 4      Q.      Well, happy birthday tomorrow.
 5      A.      Thanks.
 6      Q.      My best friend's mother's birthday's
 7      that day, too.
 8              Where were you born?
 9      A.      Yankton, South Dakota.
10      Q.      How do you spell Yankton?
11      A.      Y-A-N-K-T-O-N.
12      Q.      And you said what state is that?
13      A.      South Dakota.
14      Q.      And, where did you grow up, Shane?
15      A.      Hartington, Nebraska.
16      Q.      Okay.  How long did you live in Yankton
17      before you moved to Hartington?
18      A.      I didn't live in Yankton; it was the
19      closest hospital to Hartington.
20      Q.      I understand.
21              What's your education level?  How much
22      school did you go through?
23      A.      I have a semester left of college at the
24      University of Nebraska.
25      Q.      For technical purposes, in case we have
```

8

```
 1    to serve you with a subpoena, what is your home
 2    address?
 3    A.    In Hartington?
 4    Q.    Well, wherever you're living now.
 5    A.    Okay. Lincoln, Nebraska. It's 7224
 6    Dorchester Court.
 7    Q.    Dorchester Court?
 8    A.    Court. Yep.
 9    Q.    And that's P-O-R-T?
10    A.    C-O-U-R-T.
11    Q.    Gotcha. Okay.
12          How long have you worked at SPC, which,
13    I'm referring to SPC as Sandhills Publishing
14    Company, if that's okay with you?
15    A.    Yeah, that's fine. Um, a little over a
16    year now.
17    Q.    Since what month?
18    A.    September 23rd I started, of last year.
19    Q.    Where did you work prior to SPC?
20    A.    Um, I did a lot of small jobs my
21    freshman and sophomore year at college, um,
22    just kind of a lot of odd jobs. But, then, I
23    started working for a Purina dealership when I
24    was in seventh or eighth grade, and I worked
25    all the way through my senior year of high
```

23

1  Q.    When did you first become aware of MSR?
2  A.    A specific date?  Or --
3  Q.    Yes, or as close as you can come to
4  guessing, to establishing a date.
5  A.    Um, I would say probably last year,
6  October.
7  Q.    Who is Sydney Vincent?
8  A.    Um, he was a free listing customer that
9  came through to us.
10 Q.    What did you do to -- well, I guess
11 you've already stated, answered this question,
12 once you -- what did you do to verify that he
13 was a -- well, what, what -- let me -- let me
14 just strike that.
15       When you do your background checks, what
16 is the purpose of the background check?
17 A.    Basically, just to, you know, try to
18 weed out a lot of the scammers that potentially
19 would be coming through the website.
20 Q.    How did Mr. Vincent first contact you?
21 By phone or e-mail?
22 A.    Um, he submitted a listing to the
23 website. And, I got all of his information,
24 his, his name, his company, phone and address.
25 And, then, I tried contacting him after that.

1  you for?
2  A.    Um, basically, we, you know, we had to
3  call them and contact him, and I was able to do
4  that.  I talked to him on the phone.  And --
5  and, you know, basically, he, he had told me
6  that he, his business was moving to a different
7  building.  Um, the number checked out to a
8  business phone.  So, you know, he gave me this
9  long story about how he was changing buildings
10 and, um, all this.  And, I actually talked to
11 the guy -- excuse me.  I actually talked to the
12 guy for probably, you know, 15 --
13         MR. STICKNEY:  Hold on.  Let's
14 -- let's stand by one second.  It might be a
15 Court, the judge calling.  Hold on.
16         (A short recess was taken.)
17         MR. SALNER:  Rob, do you want to
18 take a quick break?
19         MR. STICKNEY:  No.  Just a
20 second.  I'll be right back to you.  Hold on.
21         (A short recess was taken.)
22         MR. STICKNEY:  Okay.  Sorry
23 about that.
24 Q.    (BY MR. STICKNEY) The, um -- the long
25 story that he told you about changing

1   A.    Yes, he did.
2   Q.    Okay.  Did he identify himself?
3   A.    He did not.
4   Q.    Did you determine what his name was at a
5   later date?
6   A.    Um, no, I did not.
7   Q.    How many conversations did you have with
8   this person, approximately?
9   A.    Um, two to three, I think.
10  Q.    Did you recognize the, that it was the
11  same voice from this, the same person each
12  conversation?
13  A.    Yes.
14  Q.    All right.  So, it's one person from El
15  Talla Trading Company is, has called you?
16  No -- no -- no more than one?
17  A.    Yes.
18  Q.    Did he not identify himself?  Or, do you
19  just not recall his name?
20          MR. SALNER:  Form.
21  A.    The first initial conversation, he did
22  not leave a number or a name, or, you know, I
23  had no idea who this guy was.
24  Q.    (BY MR. STICKNEY)  Did he leave a
25  message?  Is that how he first contacted you?

SHANE BECKER

**29**

1  free listing with, with our company. So, once
2  I was able to contact him and, and talk to him,
3  we went ahead and did that.
4  Q.    What posting did you -- what was he
5  advertising on that, on your company, SPC?
6  A.    Um, to -- to be honest, I really don't
7  know. I can't remember.
8  Q.    So, at the time that you took his free
9  advertisement, your compensation was not tied
10 to the number of advertisements that you
11 placed; is that correct?
12 A.    That's --
13          MR. SALNER: Well, objection.
14 Again, I will designate this, this portion as
15 confidential, but the witness can answer.
16 A.    That's correct.
17 Q.    (BY MR. STICKNEY) All right. Stand by.
18        How many ads did you place for Vincent?
19 A.    Just that one.
20 Q.    Is that all that an individual
21 advertiser is entitled to for free?
22 A.    Yes.
23 Q.    Did a representative from El Talla
24 Trading Company, my client, call you in or
25 about October, 2009?

**30**

1  A.    Yes, he did.
2  Q.    Okay. Did he identify himself?
3  A.    He did not.
4  Q.    Did you determine what his name was at a
5  later date?
6  A.    Um, no, I did not.
7  Q.    How many conversations did you have with
8  this person, approximately?
9  A.    Um, two to three, I think.
10 Q.    Did you recognize the, that it was the
11 same voice from this, the same person each
12 conversation?
13 A.    Yes.
14 Q.    All right. So, it's one person from El
15 Talla Trading Company is, has called you?
16 No -- no -- no more than one?
17 A.    Yes.
18 Q.    Did he not identify himself? Or, do you
19 just not recall his name?
20          MR. SALNER: Form.
21 A.    The first initial conversation, he did
22 not leave a number or a name, or, you know, I
23 had no idea who this guy was.
24 Q.    (BY MR. STICKNEY) Did he leave a
25 message? Is that how he first contacted you?

**31**

1  A.    He didn't leave a message with me. Um,
2  so --
3  Q.    Who did he leave a message with?
4  A.    To my knowledge, he didn't leave a
5  message with anybody.
6  Q.    So, his first conversation with you,
7  please recount it for us.
8  A.    Okay. Um, he had called in, and another
9  rep answered his phone call. And, he trans- --
10 they transferred the call to me, because he was
11 asking about this Sydney Vincent guy that I had
12 posted a free listing for.
13 Q.    Okay. Then what happened?
14 A.    Okay. And, so, he, um -- I started
15 talking to this guy, and he just, he really
16 didn't say who he was or what he was trying to,
17 what information he was trying to get. He --
18 he was just saying, um, is this guy legit? Is
19 this guy legit? Is this guy legit? And, my
20 answer to him, um, you know, I said, you know,
21 I talked to this guy on the phone, He seems
22 like a pretty nice guy, He's from Ontario,
23 Canada. Basically, I gave him all the
24 information that I thought was accurate at that
25 time, um, he was from Ontario, Canada, um, he's

**32**

1  got this machine. And, he just kept on saying,
2  Is this guy legit? And, I really didn't have
3  an answer for that. I just kept on, you know,
4  saying that he was a good guy, and he seemed
5  like a, a good guy to, to get the machine from,
6  I guess. And, um -- and that was about the end
7  of the conversation.
8  Q.    In fact, you don't know whether Vincent
9  is actually from Ontario, Canada, do you?
10 A.    At the time, I, I did believe he was.
11 Q.    But you didn't actually know for sure,
12 did you?
13          MR. SALNER: Form.
14 A.    Um, yes -- or, no, I didn't for sure.
15 Q.    (BY MR. STICKNEY) And, you didn't know
16 whether Vincent was actually a good guy, did
17 you?
18          MR. SALNER: Form.
19 A.    Um, basically, I was just going off the
20 conversation I, that I had with him. Seemed
21 like a really nice guy.
22 Q.    (BY MR. STICKNEY) Did the El Talla
23 representative -- and, for purposes of this
24 deposition, I'm going to call him Nick. Is
25 that all right with you?